**THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>TOWNSHIP OF MORRIS, NEW JERSEY; TOWNSHIP OF MORRIS COMMITTEE; DONNA J. GUARIGLIA, in her official capacity as Mayor of Morris Township; JOSEPH VUICH, in his official capacity as Consulting Township Engineer; RON AUTH, in his official capacity as Construction Code Official,<br><br>Defendants. | Civil Action No.: 2:26-cv-03412-JXN-CF<br><br>Civil Action<br><br>Motion Returnable: August 3, 2026<br><br>Oral Argument Requested |

**DEFENDANTS' MEMORANDUM OF LAW
IN SUPPORT OF THE MOTION TO DISMISS**

Matthew J. Platkin
Angela Cai
**Platkin LLP**
413 Washington Avenue, Unit 174
Belleville, NJ 07109
Phone: (973) 561-1951
mplatkin@platkinllp.com
acai@platkinllp.com

Simon C. Brewer*
Carrie Y. Flaxman*
Elena Goldstein*
**Democracy Forward Foundation**
P.O. Box 34553
Washington, D.C. 20043
Phone: (202) 448-9090
sbrewer@democracyforward.org
cflaxman@democracyforward.org
egoldstein@democracyforward.org

\* Admitted pro hac vice

Jarrid H. Kantor
Yulieika Tamayo
Alexander L. Mitchell
**Antonelli Kantor
Rivera PC**
354 Eisenhower Pkwy, Suite 1000
Livingston, NJ 07039
908-623-3676
jkantor@akrlaw.com
ytamayo@akrlaw.com
amitchell@akrlaw.com

**TABLE OF CONTENTS**

Table of Authorities ........................................................................ iii

Introduction ...................................................................................1

Background ....................................................................................2

    I.  The EPCA establishes federal energy conservation standards for
       certain appliances...................................................................2

    II. Morris Township adopts the All-Electric Ordinance ....................4

Legal Standards..............................................................................7

Argument.......................................................................................7

    I.  The EPCA does not preempt the All-Electric Ordinance...............8

      A. The EPCA's preemption provision is inapplicable by its text. .................8

      B. Statutory context and history reinforce the EPCA's limited scope..........13

      C. Federalism principles require a narrow reading of the EPCA. ................24

      D. *California Restaurant Association* does not apply here and,
         in any event, is unpersuasive. ................................................27

    II. The Mayor and Township Committee are not proper defendants.................31

Conclusion ...................................................................................33

## TABLE OF AUTHORITIES

**Cases**

*1st Westco Corp. v. Sch. Dist. of Philadelphia*, 6 F.3d 108 (3d Cir. 1993)..............32

*Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*, 410 F.3d 492 (9th Cir. 2005) ......................................14, 15, 16

*Al-Hasani v. Sec'y of U.S. Dep't of Homeland Sec.*, 81 F.4th 291 (3d Cir. 2023).................................................................................................14

*Altria Grp., Inc. v. Good*, 555 U.S. 70 (2008) .........................................................24

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)........................................................................7

*Ass'n of Contracting Plumbers of City of New York, Inc. v. City of New York*, 2025 WL 843619 (S.D.N.Y. Mar. 18, 2025) ........................4, 18, 20, 26

*Ass'n of Contracting Plumbers of City of New York, Inc. v. City of New York*, 2026 WL 1871692 (2d Cir. June 30, 2026)...... 4, 9, 11, 12, 16, 20, 22, 23, 30

*Bates v. Dow Agrosciences LLC*, 544 U.S. 431 (2005)............................................24

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).......................................................7

*Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024)...........................
............................................................... 3, 4, 9, 11, 12, 23, 27, 28, 29, 30, 31

*Carlson v. Twp. of Lower Alloways Creek*, 2008 WL 5109745 (D.N.J. Dec. 2, 2008)................................................................................33

*Dubin v. United States*, 599 U.S. 110 (2023) ....................................................18, 22

*Egelhoff v. Egelhoff*, 532 U.S. 141 (2001)...............................................................22

*Exxon Mobil Corp. v. EPA*, 217 F.3d 1246 (9th Cir. 2000) ....................................25

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000).......................13

*Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312 (2016) ...........................................23

*Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440 (1960)......................26

*Kentucky v. Graham*, 473 U.S. 159 (1985).................................................................32

*Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709 (2018)..............................22

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) ....................................7, 20

*Lupian v. Joseph Cory Holdings LLC*, 905 F.3d 127 (3d Cir. 2018) .......................24

*Massachusetts v. U.S. Dep't of Transp.*, 93 F.3d 890 (D.C. Cir. 1996)..................25

*Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996) ..........................................................24

*Mulhern Gas Co. v. Mosley*, 798 F. Supp. 3d 304 (N.D.N.Y. 2025) ........................4

*Nat. Res. Def. Council, Inc. v. Herrington*, 768 F.2d 1355
    (D.C. Cir. 1985) ..................................................................................................14, 15

*Nat'l Ass'n of Homebuilders of the U.S. v. District of Columbia*,
    2026 WL 837674 (D.D.C. Mar. 26, 2026) ...............................4, 9, 17, 21, 24

*Nat'l Ass'n of Homebuilders of U.S. v. Montgomery County*,
    2026 WL 817322 (D. Md. Mar. 25, 2026) ......................................................4

*Rinnai Am. Corp. v. S. Coast Air Quality Mgmt. Dist.,* 2025 WL 2427844
    (C.D. Cal. July 22, 2025)...................................................................................25

*Rode v. Dellarciprete*, 845 F.2d 1195 (3d Cir. 1988)...............................................32

*Sheetz v. County of El Dorado*, 601 U.S. 267 (2024)...............................................26

*Shell Petroleum, Inc. v. United States*, 182 F.3d 212 (3d Cir. 1999) ......................10

*Shuker v. Smith & Nephew, PLC*, 885 F.3d 760 (3d Cir. 2018)...............................31

*United States v. Hansen*, 599 U.S. 762 (2023) .........................................................14

*Util. Air Regul. Grp. v. EPA*, 573 U.S. 302 (2014) ...................................................13

*Van Buren v. United States*, 593 U.S. 374 (2021) ...............................................8, 10

*Wyeth v. Levine*, 555 U.S. 555 (2009) ...........................................................24

*Zahl v. Harper*, 282 F.3d 204 (3d Cir. 2002)...........................................................24

**Statutes**

42 U.S.C. § 6291(4) ...........................................................................3, 9, 29

42 U.S.C. § 6291(6) ...............................................................................2, 19

42 U.S.C. § 6292 ....................................................................................2

42 U.S.C. § 6293(b)(3).............................................................................3, 9

42 U.S.C. § 6293(b)(4).............................................................................17

42 U.S.C. § 6293(c)(1).............................................................................17

42 U.S.C. § 6294(a)(2)(I).............................................................................17

42 U.S.C. § 6294(a)(3).............................................................................17

42 U.S.C. § 6294(c)(1)(A) .............................................................................17

42 U.S.C. § 6295.....................................................................................2

42 U.S.C. § 6296(d)(1).............................................................................18

42 U.S.C. § 6297(a)(2)(A) .............................................................................3

42 U.S.C.§ 6297(c) ...............................................................................3, 7, 8, 19

42 U.S.C. § 6297(d) .............................................................................21

42 U.S.C. § 6297(d)(1)(C .............................................................................21

42 U.S.C. § 6297(d)(3)(C) .............................................................................22

42 U.S.C. § 6297(g) ...............................................................................18

42 U.S.C. § 6302(a)(5)...........................................................................18

Pub. L. No. 100-12, 101 Stat. 103 (1987)..............................................16

**Rules and Regulations**

10 C.F.R. § 429.12 .................................................................................18

47 Fed. Reg. 14,424 (Apr. 2, 1982) ..................................................12, 19

47 Fed. Reg. 57,198 (Dec. 22, 1982) .....................................................20

75 Fed. Reg. 59,470 (Sep. 27, 2010) ......................................................20

Fed. R. Civ. Pro. 12(b)(6) .........................................................................7

**Other Authorities**

Andee Krasner et al., *Cooking with Gas, Household Air Pollution, and
    Asthma: Little Recognized Risk for Children*, 83 J. Env't Health,
    no. 8, Apr. 2021 ................................................................................6

Brief for the United States in Support of Appellee, *Cal. Rest. Ass'n v.
    City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024), 2022 WL 433159....6, 13, 19

Comptroller Gen., *Report to Congress: Appliance Efficiency Standards:
    Issues Needing Resolution By DOE*, GAO/EMD-82-72 (May 14,
    1982), *available at* https://perma.cc/UE37-AY99 .......................................15

David Santana Ortiz & Mark Allen Bernstein, RAND, *Measures of
    residential energy consumption and their relationships to DOE
    policy* (1999)..............................................................................11

*Energy Intensity Indicators: Terminology and Definitions*, U.S. Dep't of
    Energy, https://perma.cc/DAN6-QT9Y (archived July 4, 2026) .................11

EPA, *Report of the Clean Air Scientific Advisory Committee: Review of the U.S. Consumer Product Safety Commission's Health Effects and Exposure Assessment Documents on Nitrogen Dioxide* (May 1986), https://perma.cc/3VR5-GG8C ..............................................6

John R. Balmes, et al., *Cooking with Natural Gas: Just the Facts, Please*, 207 Am. J. Respiratory & Critical Care Med. 996 (2023) .............................6

Martin Tolchin, *An Industry Asks for Regulation*, N.Y. Times (Feb. 17, 1987), https://perma.cc/J59B-P29C ...............................................16

Nat'l Rsch. Council, *Review of Site (Point-of-Use) and Full-Fuel-Cycle Measurement Approaches to DOE/EERE Building Appliance Energy-Efficiency Standards: Letter Report* (May 15, 2009), *available at* https://perma.cc/DE4W-V5GH ....................................12

Notice of Withdrawal of Statement of Interest, *Nat'l Ass'n of Homebuilders of the U.S. v. Montgomery County*, No. 8:24-cv-03024 (D. Md. Mar. 19, 2025), Dkt. No. 39 ................................14

R. Alta Charo et al., *Overview of Legal Issues Arising in the Development of Federal and State Appliance Efficiency Standards*, 11 Colum. J. Env't L. 315 (1986) ....................................................15

S. Rep. No. 100–6 (1987) ...............................................................15

*The Federalist No. 45* (James Madison) ..........................................22, 25

*The Inside Story: A Guide to Indoor Air Quality*, EPA, https://perma.cc/9CF4-2USJ (archived July 4, 2026) ....................5

Twp. of Morris, *Minutes of Township Committee Regular Meeting* (Apr. 20, 2022), https://perma.cc/5F96-CD3V ........................................5

Twp. of Morris, Morris Cnty.–New Jersey, Ordinance No. 08-22 (2022), *available at* https://perma.cc/9RBZ-ZXNH ...................5, 6, 28, 32

United States of America's Statement of Interest, *Nat'l Ass'n of Homebuilders of the U.S. v. Montgomery County*, No. 8:24-cv-03024 (D. Md. Jan. 17, 2025), Dkt. No. 30 ..................................14

Weiwei Lin et al., *Meta-Analysis of the Effects of Indoor Nitrogen Dioxide and Gas Cooking on Asthma and Wheeze in Children*, 42 Int'l J. Epidemiology 1724 (2013) .................................................................6

**INTRODUCTION**

This case is quintessential federal government overreach into a matter of local concern. Exercising its historic powers to protect the health and safety of its residents, Morris Township ("the Township") enacted Ordinance 08-22 requiring new apartment buildings with twelve or more units use only electricity (rather than natural gas or other fossil fuels) to supply their energy needs (the "All-Electric Ordinance"). The Township sought to do its part to combat climate change and to protect its residents, especially children, from the adverse health effects associated with the use of natural gas appliances.

Rather than respecting the Township's policy judgments, the federal government brought this suit asserting that the federal Energy Policy and Conservation Act (EPCA) preempts the All-Electric Ordinance. The EPCA does no such thing: the statute creates federal energy conservation standards for consumer appliances, and then preempts only those state and local laws that attempt to set the same type of standards for covered appliances. It does not preempt laws such as the Township's that regulate the fuel sources that local buildings use, which do not implicate consumer appliance energy conservation standards. That conclusion follows straightforwardly from the text, structure, and legislative history of the EPCA, all of which reinforce that Congress enacted a narrow preemption provision. Multiple federal courts, including the Second Circuit just last week, have recently reached

1

this same conclusion (and the United States has itself recognized in prior litigation). This conclusion also appropriately honors our country's federal structure by ensuring that state and local governments retain their core powers and responsibility to protect the health and safety of local residents.

Accordingly, the Court should hold that the All-Electric Ordinance is not preempted and dismiss the complaint with prejudice. At a minimum, the Court should dismiss the named Township officials who have no role in enforcing the All-Electric Ordinance and therefore are not proper defendants in this suit.

## BACKGROUND

### I.   The EPCA establishes federal energy conservation standards for certain appliances

**A.** The EPCA establishes a program for promoting energy conservation with respect to various consumer appliances, referred to as "covered products," including refrigerators, air conditioners, dishwashers, water heaters, and stoves. 42 U.S.C. § 6292. It authorizes the Secretary of Energy to issue "energy conservation standards" for each type of covered product. *Id.* § 6295. As expected of a technical subject, the EPCA provides precise definitions of its operative terms. In relevant part, an "energy conservation standard" is "a performance standard which prescribes a minimum level of energy efficiency or a maximum quantity of energy use" for the relevant appliance. *Id.* § 6291(6). The statute defines "energy use" as "the quantity of energy directly consumed by a consumer product at point of use, determined in

2

accordance with test procedures under section 6293." *Id.* § 6291(4). Those test procedures are "designed to produce test results which measure energy efficiency [or] energy use . . . of a covered product during a representative average use cycle or period of use." *Id.* § 6293(b)(3).

The EPCA contains a "[g]eneral rule of preemption for energy conservation standards" once a federal conservation standard takes effect for a covered product. *Id*. § 6297(c). Under that provision, "no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective with respect to such product" unless an exception applies, none of which is relevant for purposes of this motion. *Id.* A "State regulation" includes municipal laws. *See id.* § 6297(a)(2)(A).

**B.** For many years, the EPCA's preemption provision generated little litigation. But in 2024, a panel of the Ninth Circuit adopted a novel interpretation of the EPCA to hold that the statute preempted a City of Berkeley ordinance prohibiting the installation of natural gas piping in certain buildings. *See Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024). Judge Friedland, joined by ten other circuit judges, dissented from the denial of rehearing en banc, stating that the panel "misinterpret[ed] a narrow preemption provision about appliance standards" to "needlessly block[] Berkeley's effort to combat climate change." *Id.* at 1120, 1126 (Friedland, J., dissenting); *see also id.* at 1126 (Berzon, J., respecting the denial of

3

rehearing en banc). The dissenting judges "urge[d] any future court that interprets the Energy Policy and Conservation Act not to repeat the panel opinion's mistakes." *Id.* at 1119.

Following the Ninth Circuit's decision, several other state and local laws prohibiting or regulating the use of natural gas and other fossil fuels in certain buildings have been challenged. Those challenges have uniformly failed. *See Ass'n of Contracting Plumbers of City of New York, Inc. v. City of New York*, 2025 WL 843619 (S.D.N.Y. Mar. 18, 2025) (*Contracting Plumbers I*), *aff'd*, --- F.4th ---, 2026 WL 1871692 (2d Cir. June 30, 2026) (*Contracting Plumbers II*); *Mulhern Gas Co. v. Mosley*, 798 F. Supp. 3d 304 (N.D.N.Y. 2025), *aff'd sub nom. Contracting Plumbers II*, 2026 WL 1871692; *Nat'l Ass'n of Homebuilders of U.S. v. Montgomery County*, 2026 WL 817322 (D. Md. Mar. 25, 2026), *appeal pending*, No. 26-1449 (4th Cir.); *Nat'l Ass'n of Homebuilders of the U.S. v. District of Columbia*, 2026 WL 837674 (D.D.C. Mar. 26, 2026), *appeal pending*, No. 26-7050 (D.C. Cir.). In reaching their decisions, each court—including the Second Circuit, which upheld a similar local ordinance just last week—has expressly held that the EPCA does not preempt such laws and ordinances.

## II.  Morris Township adopts the All-Electric Ordinance

Like many other localities concerned about the health and safety of their residents, the Township has enacted legislation to promote the use of electricity in

4

new buildings. In 2022, the Morris Township Committee unanimously enacted the All-Electric Ordinance. Twp. of Morris, N.J, Ordinance No. 08-22 (2022), *available at* https://perma.cc/9RBZ-ZXNH (codified at Morris Twp. Code 2026-03-18, ch. 194). In introducing the All-Electric Ordinance, the Township identified "adverse health effects" associated with the use of natural gas as an energy source, including the "risk of carbon monoxide poisoning," particularly for children. All-Electric Ordinance pmbl. The Committee also expressed concern about "the serious threats posed by climate change," which are exacerbated by the use of fossil fuels. *Id.*; *see also* Twp. of Morris, *Minutes of Township Committee Regular Meeting* 18–20 (Apr. 20, 2022) (statements of Mayor Gyorfy and Committee Member Ravitz), https://perma.cc/5F96-CD3V. The Township also considered that the All-Electric Ordinance aligned with the State's sustainability goals and had the potential for future cost savings. *Minutes of Township Committee Regular Meeting* 4.

Longstanding scientific research, reflected in prior statements from the federal government, supports the Township's health and safety concerns. *See, e.g.*, *The Inside Story: A Guide to Indoor Air Quality*, EPA, https://perma.cc/9CF4-2USJ (archived July 4, 2026) (describing health effects of elevated carbon monoxide and nitrogen dioxide levels, and listing gas stoves as a possible source); EPA, *Report of the Clean Air Scientific Advisory Committee: Review of the U.S. Consumer Product*

*Safety Commission's Health Effects and Exposure Assessment Documents on Nitrogen Dioxide* (May 1986), https://perma.cc/3VR5-GG8C.[1]

To mitigate the health and safety risks identified by the Township, the All-Electric Ordinance requires that new apartment buildings with twelve or more units "use[] a permanent supply of electricity as the sole source of energy to meet building energy needs." All-Electric Ordinance §§ 1, 2. If construction of an all-electric building "is physically or technically infeasible," however, the Township can grant a modification to permit the building's construction. *Id.* § 3. A building permit applicant that seeks such a modification must agree "to pay any costs related to the connection of any gas main and/or transmission system." *Id.* § 4.

For nearly four years, the All-Electric Ordinance has been in effect without controversy. Following the change in Administration, however, the federal government reversed its longstanding position on the scope of the EPCA's preemption provision. *Compare, e.g.*, Brief for the United States in Support of Appellee, *Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024), 2022 WL 433159 (hereinafter, "*Cal. Rest. Ass'n* U.S. Br."), *with* Dkt. No. 1 ("Compl.").

---

[1] *See also, e.g.*, John R. Balmes, et al., *Cooking with Natural Gas: Just the Facts, Please*, 207 Am. J. Respiratory & Critical Care Med. 996 (2023); Andee Krasner et al., *Cooking with Gas, Household Air Pollution, and Asthma: Little Recognized Risk for Children*, 83 J. Env't Health, no. 8, Apr. 2021, at 14; Weiwei Lin et al., *Meta-Analysis of the Effects of Indoor Nitrogen Dioxide and Gas Cooking on Asthma and Wheeze in Children*, 42 Int'l J. Epidemiology 1724 (2013).

It brought this suit against Morris Township, the Mayor, the Township Committee, the Township Engineer, and the Construction Code Official (collectively, Defendants). *See generally* Compl. The sole count asserts that the EPCA preempts the All-Electric Ordinance. Defendants now move to dismiss the complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).

## LEGAL STANDARDS

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint that fails "to state a claim upon which relief can be granted." "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Mere "legal conclusions" are not presumed to be true. *Id.* This Court owes no deference to the government's interpretation of federal statutes. Instead, the Court applies its own "independent judgment" based on traditional principles of statutory interpretation. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 385 (2024).

## ARGUMENT

The Complaint must be dismissed because the EPCA does not preempt the All-Electric Ordinance. The EPCA provision invoked by the United States, 42 U.S.C. § 6297(c), prevents state and local governments from setting performance standards for certain consumer appliances. It does not limit their authority to establish general

7

standards governing what sources of fuel are used in their local buildings. The latter is precisely what the Township has done here. Accordingly, the Complaint fails to state a claim upon which relief can be granted.

## I.   The EPCA does not preempt the All-Electric Ordinance.

By its plain terms, the EPCA does not preempt the All-Electric Ordinance. The text, context, and history of the statute all indicate the narrowness of the preemption provision on which the Complaint relies. And if any doubt remained, the presumption against preemption would require reading the preemption provision narrowly.

### A. The EPCA's preemption provision is inapplicable by its text.

**1.** By its plain terms, the EPCA's preemption provision does not apply to the All-Electric Ordinance. The relevant portion of the EPCA provides that "no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective with respect to such product," subject to certain exceptions not relevant here. 42 U.S.C. § 6297(c). The essence of the complaint is that the All-Electric Ordinance's prohibition of natural gas as a fuel source in certain apartment buildings regulates the "energy use" of covered appliances, and therefore that it is preempted. *See* Compl. ¶ 41. That is wrong. The All-Electric Ordinance does not address the "energy use" of appliances as the EPCA defines that term, so it is not preempted. *See Van Buren v. United States*, 593 U.S. 374, 387 (2021) ("When

8

a statute includes an explicit definition of a term, we must follow that definition, even if it varies from a term's ordinary meaning." (quotation marks omitted)).

The EPCA precisely defines a covered appliance's "energy use" as "the quantity of energy directly consumed by a consumer product at point of use, determined in accordance with test procedures under section 6293 of this title." 42 U.S.C. § 6291(4). In turn, the test procedures under section 6293 are "designed to produce test results which measure . . . energy use . . . during a representative average use cycle or period of use." *Id.* § 6293(b)(3). Put together, those provisions make clear that an appliance's "energy use" is a "standardized, fixed measure" of how an appliance performs under certain test conditions designed to simulate typical consumer use. *Contracting Plumbers II*, 2026 WL 1871692, at *4. That measure, which is determined before the appliance is introduced into commerce, depends upon the appliance's design and manufacture, not its ultimate use by consumers. *See id.*; *Cal. Rest. Ass'n*, 89 F.4th at 1121 (Friedland, J., dissenting); *District of Columbia*, 2026 WL 837674, at *5 ("Energy efficiency or use in EPCA refers to a fixed measure of an appliance's performance capacity."). It follows that, as the EPCA defines the term, "energy use" does not describe whether or how an appliance is operated in any particular location. An appliance that sits unopened in a consumer's garage has precisely the same "energy use," as the statute defines the term, as the equivalent model that a neighbor installs and uses every day.

9

The United States' preemption theory necessarily fails because it relies on a reading of the EPCA that is unsupported by the statute's text. The Complaint asserts that the All-Electric Ordinance concerns covered products' "energy use" because it regulates whether and how covered appliances can consume natural gas in certain buildings. *See* Compl. ¶ 41. But the EPCA's preemption provision does not address the availability of certain fuel sources in particular buildings, nor does it preempt laws that favor installation of a particular kind of appliance. Instead, it ensures that appliance manufacturers do not face a patchwork of energy conservation standards that govern the appliances they make. The All-Electric Ordinance does not attempt to prescribe such an energy conservation standard for any appliance, so it is not preempted.

**2.** The fact that the EPCA defines energy use to measure of energy consumption at "point of use" also does not advance the government's theory. In this context, "point of use" does not refer to how much energy appliances consume in a particular apartment or home. Rather, the statutory term "point of use" is a technical term governing how an appliance's energy use should be calculated. That technical meaning controls. *See, e.g.*, *Van Buren*, 593 U.S. at 388 n.7 ("[W]hen a statute, like this one, is addressing a technical subject, a specialized meaning is to be expected." (cleaned up)); *Shell Petroleum, Inc. v. United States*, 182 F.3d 212, 217 (3d Cir. 1999) ("[W]here Congress has used technical words or terms of art, it is proper to

10

explain them by reference to the art or science to which they are appropriate." (citation omitted)).

The EPCA's use of the term "point of use" is meant to distinguish one form of measurement of energy from alternative technical forms of measurement. An appliance's energy use can be measured in two different ways. One measure—known as 'site' or 'point-of-use' energy—captures only the energy consumed by the appliance's operation. *See, e.g.*, *Cal. Rest. Ass'n*, 89 F.4th at 1123 (Friedland, J., dissenting) (citing David Santana Ortiz & Mark Allen Bernstein, RAND, *Measures of residential energy consumption and their relationships to DOE policy* xiii–xiv, 6–7 (1999)); *Contracting Plumbers II*, 2026 WL 1871692, at \*14 (citing *Energy Intensity Indicators: Terminology and Definitions*, U.S. Dep't of Energy, https://perma.cc/DAN6-QT9Y (archived July 4, 2026)). By contrast, a different measurement—known as "source energy"—includes the site energy plus the energy necessary to produce and transmit the energy to the site. *See id.* Technical documents regularly reflect that distinction. *See Cal. Rest. Ass'n*, 89 F.4th at 1123–24 (Friedland, J., dissenting) (collecting many such sources); *Contracting Plumbers II*, 2026 WL 1871692, at \*15–16 (same). Different methodologies can be significant for policymakers. *See, e.g.*, Nat'l Rsch. Council, *Review of Site (Point-of-Use) and Full-Fuel-Cycle Measurement Approaches to DOE/EERE Building Appliance*

11

*Energy-Efficiency Standards: Letter Report* (May 15, 2009), *available at* https://perma.cc/DE4W-V5GH (evaluating the two methodologies).

For present purposes, the relevant detail is that "point of use" is a term of art directing the Department of Energy (DOE) to use a particular methodology for measuring "energy use." *See Cal. Rest. Ass'n,* 89 F.4th at 1123 (Friedland, J., dissenting) (the term "give[s] a technical instruction to DOE and manufacturers"); *Contracting Plumbers II*, 2026 WL 1871692, at \*15 (citing DOE documents explaining that the EPCA requires measuring site energy, rather than source energy, to determine a covered product's "energy use"). That meaning dates back to the time of the preemption provision's enactment. *See, e.g.*, Energy of Conservation Program for Consumer Products; Proposed Rulemaking and Public Hearings Regarding Energy Efficiency Standards for Refrigerators and Refrigerator-Freezers, Freezers, Clothes Dryers, Water Heaters, Room Air Conditioners, Kitchen Ranges and Ovens, Central Air Conditioners, and Furnaces – Notice of Proposed Rule Making, 47 Fed. Reg. 14424, 14427 (Apr. 2, 1982) ("'Energy use' is defined in the Act as the quantity of energy directly consumed by a consumer product at point of use. This is sometimes referred to as 'site' energy, as opposed to source energy.").

The government's reading of "point of use" would transform that statutory meaning into a broader, colloquial definition that is unsupported by the text. While the All-Electric Ordinance requires that appliances in covered apartment buildings

12

may only use electricity as that is the only energy source available, that does not demonstrate that EPCA preemption applies. Adopting the government's preemption theory misreads the statute, including by improperly redefining the term "point of use" in a manner unsupported by the term's understood, technical meaning in the energy context. And it would have bizarre consequences, as further detailed below, for the entire regulatory landscape. The Court should therefore reject that interpretation and join the growing number of courts holding that EPCA does not preempt electrification laws such as the Township's.

## B. Statutory context and history reinforce the EPCA's limited scope.

Other key features of the EPCA's statutory scheme support the same textual conclusion. It is a "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 320 (2014) (quotation marks and citation omitted). "A court must therefore interpret the statute as a symmetrical and coherent regulatory scheme." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (quotation marks and citation omitted). Adopting the government's reading would contravene these principles—as the United States itself recognized in prior filings. *See Cal. Rest. Ass'n* U.S. Br.; United States of America's Statement of Interest, *Nat'l Ass'n of Homebuilders of the U.S.*

*v. Montgomery County*, No. 8:24-cv-03024 (D. Md. Jan. 17, 2025), Dkt. No. 30 (hereinafter, "U.S. Statement of Interest").[2]

**1.** The statutory and legislative history illustrates that the EPCA narrowly preempts only those state and local laws that attempt to set energy conservation standards, or their functional equivalent, by directly regulating covered products' energy use. *See, e.g.*, *United States v. Hansen*, 599 U.S. 762, 775 (2023) (observing that "[s]tatutory history" provides "important" context).[3] The original EPCA, enacted to reduce energy consumption and promote energy efficiency after the fuel crisis in 1973–74, directed the federal government to establish testing and labeling requirements for consumer appliances, and authorized voluntary or (if necessary) mandatory energy efficiency standards for covered appliances. *See Nat. Res. Def. Council, Inc. v. Herrington*, 768 F.2d 1355, 1365 (D.C. Cir. 1985) (describing the law's original provisions). The law "allowed state regulations that differed from the federal regulations if the state regulations were justified by a substantial state or local need, did not interfere with interstate commerce, and were more stringent than the federal standard." *Air Conditioning & Refrigeration Inst. v. Energy Res.*

---

[2] Following the change in administration, the government withdrew its statement of interest. *See* Notice of Withdrawal of Statement of Interest, *Nat'l Ass'n of Homebuilders of the U.S. v. Montgomery County*, No. 8:24-cv-03024 (D. Md. Mar. 19, 2025), Dkt. No. 39.

[3] "Statutory history is the record of enacted changes Congress made to the relevant statutory text over time." *Al-Hasani v. Sec'y of U.S. Dep't of Homeland Sec.*, 81 F.4th 291, 298 n.4 (3d Cir. 2023) (quotation marks and citation omitted).

14

*Conservation & Dev. Comm'n*, 410 F.3d 492, 499 (9th Cir. 2005). A few years later, Congress enacted amendments that required minimum energy efficiency standards for covered products, and it allowed states to enact more stringent standards "*only* if the Secretary found there was a significant state or local interest to justify the state's regulation and the regulation would not unduly burden interstate commerce." *Id.*

DOE, however, failed to prescribe the required standards. *See Herrington*, 768 F.2d at 1433 (holding unlawful DOE's failure to issue standards as required). DOE "also initiated a general policy of granting petitions from States requesting waivers from preemption. As a result, a system of separate State appliance standards had begun to emerge and the trend was growing." *Air Conditioning*, 410 F.3d at 499 (cleaned up) (quoting S. Rep. No. 100–6, at 4 (1987)); *see also* Comptroller Gen., *Report to Congress: Appliance Efficiency Standards: Issues Needing Resolution By DOE*, GAO/EMD-82-72, at 25 (May 14, 1982), *available at* https://perma.cc/UE37-AY99 (expressing concern that DOE's actions would lead to "a proliferation of divergent state standards"). Various states and localities adopted a "patchwork" of regulations, which "increasingly complicate[d] [appliance manufacturers'] design, production and marketing plans." *Air Conditioning*, 410 F.3d at 500 (quoting S. Rep. No. 100–6, at 4); *see also, e.g.*, R. Alta Charo et al., *Overview of Legal Issues Arising in the Development of Federal and State Appliance Efficiency Standards*, 11 Colum. J. Env't L. 315, 336–49 (1986) (documenting different state approaches). That

15

system burdened appliance manufacturers trying to design products to satisfy various energy efficiency standards. As a result, manufacturers called for more nationally uniform energy efficiency standards. *See* Martin Tolchin, *An Industry Asks for Regulation*, N.Y. Times (Feb. 17, 1987), https://perma.cc/J59B-P29C.

Against that backdrop, Congress enacted the National Appliance Energy Conservation Act of 1987, a "negotiated a compromise solution" between the appliance industry and environmental advocates. *Id.*; *see generally* Pub. L. No. 100-12, 101 Stat. 103 (1987). That legislation directly set certain energy conservation standards, and it limited DOE's ability to grant preemption waivers. The legislation balanced manufacturers' desire for uniformity—to simplify their design and production plans—with the need for more energy efficient appliances. *See Air Conditioning*, 410 F.3d at 499. Those amendments provide the basic framework of EPCA preemption that exists today.

That history demonstrates that the EPCA's preemption provision, as amended, aims to ensure that appliance manufacturers can generally follow nationally uniform, consistent energy conservation standards when designing, manufacturing, and labelling their products. When Congress amended the preemption provision in the 1980s, it did so in concert with corresponding steps to strengthen the federal energy conservation standards. *See Contracting Plumbers II*, 2026 WL 1871692, at *10 (noting the "symmetry between the statute's definition of an 'energy conservation

16

standard' and the text it uses in its preemption provision"). The government's newfound interpretation of the preemption provision is unmoored from this history. It would sweep in laws, like the All-Electric Ordinance, that have no effect on manufacturers' ability to meet and rely upon the relevant federal energy conservation standards. It would also sweep in laws that have never been considered preempted, such as fire-safety laws, with only incidental effects on covered products' usage. There is no basis in the statutory or legislative history for adopting such a dramatic expansion without any clear textual basis.

**2.** Statutory context supports the same interpretation. Many statutory provisions rely on the premise that energy use is a fixed measure determined before an appliance ever reaches a consumer. If energy use depended on whether and how a product was actually used in a consumer's residence, the statute could not function.

Consider first the statute's various labeling and disclosure requirements. *See, e.g.*, 42 U.S.C. § 6294(a)(2)(I), (a)(3) (requiring disclosures related to covered products' "energy use"; *id.* §§ 6293(b)(4), 6294(c)(1)(A) (requiring disclosure of "operating costs," which is based on "measurements of energy use"); *id.* § 6293(c)(1) (forbidding representations about the "energy use" of a covered product "unless such product has been tested in accordance with such test procedure and such representation fairly discloses the results of such testing"). Those labels "must necessarily report a static figure." *District of Columbia*, 2026 WL 837674, at \*8.

17

After all, a manufacturer cannot know how the consumer will use those appliances in any particular location, so there is no way it can label an appliance based on a definition of energy use that turns on where the appliance is installed or operated. That indicates that energy use does not turn on whether or how any particular consumer operates an appliance. Indeed, the EPCA's warranty provision says as much. That subsection states that EPCA-required disclosures do not create any warranty that the "energy use" defined by statute will be equivalent to appliances' energy consumption under "conditions of actual use." 42 U.S.C. § 6297(g).

Similarly, if a covered appliance's "energy use" depended on how it was installed or used in consumers' residences, then it is difficult to understand how an appliance manufacture could test for and certify compliance with the applicable conservation standards. *See id.* § 6296(d)(1) (authorizing DOE to require information or reports about the energy use of covered products); 10 C.F.R. § 429.12 (requiring such information and certification of compliance). Ultimately, a covered product must comply with the relevant federal conservation standard to be sold in interstate commerce. 42 U.S.C. § 6302(a)(5). "If . . . 'energy use' refers to the amount of energy a product actually consumes in the hands of a consumer, then this rule would be impossible to implement." *Contracting Plumbers I*, 2025 WL 843619, at *5.

18

The relevant subsection's heading reinforces those limits in the statutory text. *See, e.g.*, *Dubin v. United States*, 599 U.S. 110, 121 (2023) (explaining that titles and headings can inform the meaning of statutory language). The title—"General rule of preemption *for energy conservation standards* when Federal standard becomes effective for product," 42 U.S.C. § 6297(c) (emphasis added)—illustrates that Congress intended to preempt laws that effectively set "energy conservation standards" for covered appliances. In other words, Congress's concern was state and local laws that directly and substantially regulate the energy efficiency or energy use of covered products. *See id.* § 6291(6) (defining "energy conservation standard"). The provision does not preempt state and local regulations that merely have an incidental effect on whether or how covered appliances are used, because those are not equivalent to an energy conservation standard. As a result, they do not pose any threat to the EPCA's regulatory scheme.

Until last year, the federal government had consistently recognized as much, resulting in a "settled understanding shared by [DOE] and the States over the allocation of regulatory authority." *Cal. Rest. Ass'n* U.S. Br., 2022 WL 433159, at *26. That understanding dates back decades, when DOE first articulated its understanding of the scope of EPCA preemption. In an early EPCA rulemaking, DOE distinguished state laws with "a secondary and incidental effect of improving the efficiency of a covered product," which would not be preempted, from those that

19

had a direct purpose and effect of improving the energy efficiency of an appliance. 47 Fed. Reg. at 14456. Consequently, the EPCA would not preempt "a law on fire safety," *id.*, or a "[p]rohibition against placing oversized furnaces and air conditioners in new buildings," Energy Conservation Program for Consumer Products; Final Rule for Clothes Dryers and Kitchens Ranges and Ovens – Final Rule, 47 Fed. Reg. 57198, 57215 (Dec. 22, 1982).[4] Nor would the EPCA preempt "local noise ordinances and outdoor lighting restrictions," even though those laws "could have the effect of restricting or prohibiting the use of certain covered products." U.S. Statement of Interest 10–11.

The principle underlying these distinctions maintained by the federal government for years is that the EPCA preempts only state and local laws that are energy conservation standards or their functional equivalents. *See* Energy Conservation Program: Energy Conservation Standards for Residential Refrigerators, Refrigerator-Freezers, and Freezers – Notice of Proposed Rule, 75 Fed. Reg. 59470, 59530 (Sep. 27, 2010) ("DOE interprets 'regulation concerning energy use' to be equivalent to 'energy conservation standard.'"). That interpretation, "issued roughly contemporaneously with enactment of the statute"

---

[4] For example, the EPCA would not preempt a ban on covered products that use combustion, such as kerosene heaters, enacted to avoid fires. *See Contracting Plumbers II*, 2026 WL 1871692, at *13; *see also Contracting Plumbers I*, 2025 WL 843619, at *6 (collecting additional examples of critical fire-safety laws that potentially implicate covered products).

20

and which "remained consistent over time" (until very recently), helps illustrate the statute's meaning. *Loper Bright*, 603 U.S. at 370. As we have explained, the All-Electric Ordinance is not the equivalent of an energy conservation standard. It does not regulate the "energy use" of covered appliances, as that term is defined. As a result, its incidental effects on the installation of covered appliances do not trigger preemption any more than a ban on oversized furnaces would.

Finally, the provision of the EPCA providing for preemption waivers, 42 U.S.C. § 6297(d), is consistent with this narrower interpretation. *Contra* Compl. ¶ 39. That provision recognizes that states and localities may have "unusual or compelling" interests that justify a deviation from the federal energy conservation standards, and it sets forth criteria on which DOE should evaluate waiver requests, including whether those interests "are substantially different in nature or magnitude than those prevailing in the United States generally" and the "costs, benefits, burdens, and reliability" of any "energy . . . savings" that could be achieved. *Id.* § 6297(d)(1)(C). If the EPCA preempted laws with merely incidental effects on covered products' usage—such as fire codes—then these criteria would make little sense. Instead, those criteria make sense only if the scope of preemption is confined to energy conservation standards, or their functional equivalents, which primarily concern energy-conservation objectives. In short, the "waiver provision, too, reflects congressional concern for how a state or local law might affect an appliance's design

21

and production." *District of Columbia*, 2026 WL 837674, at *9 (noting that DOE also must consider 'the extent to which the State regulation would cause a burden to manufacturers to *redesign and produce* the covered product type (or class)'" (quoting 42 U.S.C. § 6297(d)(3)(C)).

**3.** The fact that the EPCA preempts laws "concerning" energy use does not expand its scope to cover the All-Electric Ordinance. *Contra* Compl. ¶¶ 40–41. In this context, "concerning" and "related to" are synonyms. *See Contracting Plumbers II*, 2026 WL 1871692 at *13 ("[W]e can treat EPCA's deployment of 'concerning' as synonymous with 'related to,' a term courts have regularly interpreted in other preemption contexts."); *see also Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 717 (2018). While broad, those terms require meaningful limits on the scope of preemption. "If 'relate to' were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes there would be no limits, as really, universally, relations stop nowhere." *Dubin*, 599 U.S. at 119 (cleaned up). As a result, the court "must . . . look to statutory context," *id.*, and avoid "uncritical literalism that would make pre-emption turn on infinite connections." *Egelhoff v. Egelhoff*, 532 U.S. 141, 147 (2001) (cleaned up). Otherwise, the federal government's unlimited authority would trample basic principles of federalism. *See The Federalist No. 45* (James Madison) ("The powers delegated by the proposed Constitution to the federal government are few and defined.").

22

The All-Electric Ordinance lacks the requisite connection to "energy use" to fall within the preemption provision's scope. *See Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 320 (2016) (evaluating the federal statute's "objectives" and the state law's "effect"). As established, *see supra* pp. 8–17, the "EPCA's 'objectives' were to establish a standardized set of performance standards for covered appliances to promote energy conservation." *Contracting Plumbers II*, 2026 WL 1871692, at *8. The All-Electric Ordinance does not have any effect on those standards. Appliance manufacturers remain free to design, produce, sell, and market covered products in conformity with the federal energy conservation standards. The All-Electric Ordinance "simply directs consumers to one set of products with one set of federal efficiency standards (electric appliances) over another set of products with different federal efficiency standards (gas appliances)." *Cal. Rest. Ass'n*, 89 F.4th at 1126 (Friedland, J., dissenting). That is no different than countless other laws or ordinances that might have an indirect effect on the demand for covered appliances using certain fuel sources.

Congress's use of the word "concerning" is not an invitation to expand the scope of EPCA preemption without limit. Because the United States' interpretation relies on the type of "uncritical literalism" the Supreme Court has rejected, the Court should decline to adopt its interpretation here.

23

## C. Federalism principles require a narrow reading of the EPCA.

Core federalism principles also reinforce the narrow limits of the EPCA's preemption provision. To be clear, the text and context conclusively demonstrate that the EPCA does not preempt the All-Electric Ordinance. *See, e.g.*, *District of Columbia*, 2026 WL 837674, at *12 (rejecting the government's interpretation of the EPCA "[w]ith or without federalism principles to aid its analysis"). But if any doubt remained about whether the EPCA preempted the All-Electric Ordinance, the presumption against preemption would support upholding the Ordinance.

Because "the States are independent sovereigns in our federal system," courts apply a presumption against preemption when interpreting federal statutes. *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)). "When addressing questions of express or implied preemption," the analysis begins "with the assumption that the historic police powers of the States are not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008) (quotation marks and alteration omitted); *Lupian v. Joseph Cory Holdings LLC*, 905 F.3d 127, 131 (3d Cir. 2018) ("When a federal statute contains a provision preempting state law claims that pertain to 'areas of traditional state regulation' or police power, we apply a presumption against preemption. (quoting *Bates*, 544 U.S. at 449).

24

The All-Electric Ordinance represents the Township's exercise of the "historic police powers" to regulate "matters of health." *Zahl v. Harper*, 282 F.3d 204, 211 (3d Cir. 2002); *see also, e.g.*, *Wyeth v. Levine*, 555 U.S. 555, 565 n.3 (2009) (applying the presumption against preemption to "state regulation of health and safety"). By the same token, "[e]nvironmental regulation," including "[a]ir pollution prevention," has traditionally fallen "under the broad police powers of the states." *Exxon Mobil Corp. v. EPA*, 217 F.3d 1246, 1255 (9th Cir. 2000) (citing *Massachusetts v. U.S. Dep't of Transp.*, 93 F.3d 890, 894 (D.C. Cir. 1996)); *see also Rinnai Am. Corp. v. S. Coast Air Quality Mgmt. Dist.,* 2025 WL 2427844, at *6 (C.D. Cal. July 22, 2025) (declining to interpret the EPCA in a way that "would upset the historic and recognized powers of states and local governments to set emissions standards"). The long tradition of states enacting standards to promote the prosperity of their people and the state stretches back to our nation's founding. *See The Federalist No. 45* (James Madison) ("The powers reserved to the several States will extend to all the objects which, in the ordinary course of affairs, concern the lives, liberties, and properties of the people . . . and prosperity of the State.").

The All-Electric Ordinance fits squarely within that long tradition by regulating indoor air quality to combat climate change and to protect Township residents from well-documented adverse health effects. *See supra* pp. 4–6. Such "[l]egislation designed to free from pollution the very air that people breathe clearly falls within

25

the exercise of even the most traditional concept of what is compendiously known as the police power." *Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440, 442 (1960) (upholding application of local smoke abatement ordinance against a preemption challenge).

Were that not enough, states and localities have likewise long exercised their police powers to enact and enforce building codes. *See, e.g.*, *Sheetz v. County of El Dorado*, 601 U.S. 267, 274 (2024) (recognizing the "police power to engage in land-use planning"). "Regulations prohibiting the use of certain types of fuels and appliances in residential, commercial, and industrial settings are integral" to such codes. *Contracting Plumbers I*, 2025 WL 843619, at *6 (collecting examples in New York City). Holding that EPCA preemption applies here would have alarming consequences for these regulations. "[I]f EPCA preempts a regulation effectively banning the use of fossil fuel powered appliances in a subset of new residential buildings, then by the same logic it might preempt a regulation that effectively prohibits the use of such appliances in close proximity to gas station pumps." *Id.* Applying the presumption against preemption helps guard against such potentially disastrous outcomes that Congress could not have intended.

Accordingly, if the Court has any doubt about the scope of the EPCA's preemption provision after considering the statutory text and context, it should apply

26

the presumption against preemption. That presumption confirms that the All-Electric Ordinance is not preempted, and therefore that the United States fails to state a claim.

### D. *California Restaurant Association* does not apply here and, in any event, is unpersuasive.

The Complaint invokes the *California Restaurant Association* panel decision as the principal authority for its preemption theory. *See* Compl. ¶¶ 5, 41. That reliance is misplaced for two reasons. First, the decision is inapplicable by its own terms. Second, the panel majority erred in concluding that the EPCA preempted the local ordinance at issue in that case. The Court should therefore decline to adopt the panel opinion's reasoning and instead adopt the interpretation articulated in Judge Friedland's dissent from the denial of rehearing en banc and that of every other court to have considered this issue.

**1.** As an initial matter, the Ninth Circuit's opinion makes clear its limited scope. The challenged Berkeley ordinance prohibited "Natural Gas Infrastructure" (essentially defined as pipes for carrying gas) within newly constructed buildings. *Cal. Rest. Ass'n*, 89 F.4th at 1099. While holding that the EPCA preempted that ordinance, the court disclaimed a broader ruling. By its own terms, the *California Restaurant Association* opinion "has nothing to say about a State or local government regulation of a utility's distribution of natural gas to premises where covered products might be used," and instead addresses only "building codes that regulate the gas usage of covered appliances on premises *where gas is otherwise*

27

*available*." *Id.* at 1103 (emphasis added); *see also id.* at 1106 ("This is a narrow opinion about Berkeley's building codes."). The panel declined to make any ruling on whether a local government must "maintain or expand the availability of a utility's delivery of gas" to buildings. *Id.* at 1106.

Unlike the Berkeley ordinance, the All-Electric Ordinance does not address the piping within a building. Instead, it addresses the fuel sources that new apartment buildings with twelve or more units may draw upon to supply their energy needs. *See* All-Electric Ordinance § 1. Those new buildings may not be connected to any gas infrastructure. *See id.* § 4. Since there will be no existing gas infrastructure in buildings constructed under the All-Electric Ordinance, *California Restaurant Association* does not apply, as gas is not *otherwise* available. Thus, the All-Electric Ordinance is not preempted.

**2.** Even if *California Restaurant Association* were on point, the Court should decline to follow it. As Judge Friedland explained her dissent from the denial of rehearing en banc, the panel opinion "misinterprets the statute's key terms to have colloquial meanings instead of the technical meanings," leading it to a "clear misinterpretation" of the EPCA. 89 F.4th at 1120. Ten other circuit judges concurred in Judge Friedland's opinion, and subsequently district judges in the Northern District of New York, the Southern District of New York, the District of Maryland, and the District of Columbia all have endorsed her reasoning. Just last week, the

28

Second Circuit agreed in a published opinion. For ease of reference, we briefly summarize the errors in the Ninth Circuit panel opinion, as identified by the Second Circuit and Judge Friedland's dissent.

First, the panel focused on whether the Berkeley ordinance concerned energy use because it "lower[ed] the 'quantity of energy' consumed to 'zero'" for gas appliances. *Id.* at 1102. That fundamentally misconceives the relevant inquiry. As explained above, the measure of a covered product's "energy use" turns on how it performs under the relevant "test procedures" established by statute and regulation. 42 U.S.C. § 6291(4). An ordinance that restricts or bans natural gas infrastructure in particular buildings does not affect in any manner how a covered product that uses natural gas performs under those test procedures, which is set before the appliance leaves the factory. As a result, an ordinance like that in Berkeley or the Township does not affect the "energy use" of such products, let alone require them to use "zero" energy. But the Ninth Circuit panel opinion simply elided that portion of the statutory definition, leading to an incorrect understanding of which laws affect "energy use."

Second, the panel misconstrued the statutory term "point of use" by failing to give it its specialized, industry-relevant meaning. *See Cal. Rest. Ass'n,* 89 F.4th at 1101–02 (giving the term its ordinary, colloquial meaning). The opinion does not grapple with the technical meaning that phrase has long held in this regulatory

29

sphere. *See id.* Nor does the opinion explain how DOE could administer, or manufacturers could comply with, the statutory and regulatory requirements if "point of use" refers to the physical locations where appliances are used rather than as an instruction for how to measure their performance in test conditions before they leave the factory. *See supra* pp. 17–18. Using "point of use" in the colloquial sense to mean where the appliance is used threatens to destabilize the EPCA's mandatory standards, labeling requirements, and certification obligations that rely on the definition of "energy use."

Third, the Ninth Circuit attributed "critical importance" to the fact that the EPCA contains a preemption exception for certain building codes. *Cal. Rest. Ass'n*, 89 F.4th at 1101. All that establishes, though, is that *some* building code requirements could be preempted, not that *all* building code requirements are. For example, a building code requirement that set aggregate limits on building-wide energy consumption might indirectly, and impermissibly, regulate individual appliances' energy use or energy efficiency. *See Contracting Plumbers II*, 2026 WL 1871692, at *11; *see also Cal. Rest. Ass'n*, 89 F.4th at 1125 (Friedland, J., dissenting) ("EPCA contemplates preempting building codes that set building-wide energy efficiency standards that can only be met through the use of hyper-efficient appliances."). In other words, such a requirement would by implication require appliances that are more efficient than the federal energy conservation standards. But an ordinance

30

regulating fuel sources does not have that effect: it merely shifts demand from one type of covered product (natural gas appliances) to another (electric appliances) with a separate energy conservation standard.

Finally, the Ninth Circuit did not apply the presumption against preemption in construing the EPCA. *See Cal. Rest. Ass'n*, 89 F.4th at 1101. Judge O'Scannlain wrote separately to note that he joined the majority opinion only because he understood Ninth Circuit precedent to foreclose reliance on the presumption against preemption. *See id.* at 1107 (O'Scannlain, J., concurring). By contrast, the Third Circuit "continue[s] to apply the presumption against preemption to claims, like those in this case, that invoke the historic police powers of the States," even when a federal statute contains an express preemption clause. *Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 771 n.9 (3d Cir. 2018).

For the reasons explained above, the Court should uphold the Ordinance notwithstanding the *California Restaurant Association* decision, following the reasoning of every other court to dismiss a similar challenge.

## II.  The Mayor and Township Committee are not proper defendants.

For the foregoing reasons, the Complaint should be dismissed with prejudice in its entirety. At a minimum, however, the Complaint fails to state a claim for relief with respect to the Township Committee and the Mayor, who are not plausibly alleged to have any role in enforcing the All-Electric Ordinance. *See* Compl. ¶ 28.

The All-Electric Ordinance designates the Township Engineer and the Construction Code Official as the municipal officers responsible for implementing the Ordinance. All-Electric Ordinance § 3. The mere fact that the Mayor may exercise general supervision over Township officials does not demonstrate that she is a proper defendant in this action challenging a particular municipal ordinance. *Cf. 1st Westco Corp. v. Sch. Dist. of Philadelphia*, 6 F.3d 108, 113 (3d Cir. 1993) ("General authority to enforce the laws of the state is not sufficient to make government officials the proper parties to litigation challenging the law."). Similarly, the mere fact that the Township Committee had the power to approve the All-Electric Ordinance fails to show that the body is a proper defendant. *Cf. Rode v. Dellarciprete*, 845 F.2d 1195, 1208 (3d Cir. 1988) (holding that the Governor and Attorney General were not proper defendants because their "power to review and approve a departmental regulation" did not demonstrate any "duty to enforce that regulation").

Finally, because the Township is a named party in this matter (Compl. ¶ 8), it is unnecessary to maintain actions against individual Township Officials. In these circumstances, "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). That makes any claims against individual Township officials "redundant." *Carlson v. Twp. of Lower Alloways Creek*, 2008 WL 5109745, at *4 n.1 (D.N.J. Dec. 2,

32

2008). As a result, the Township Committee and the Mayor should not be required to participate in any further proceedings in this case.

## CONCLUSION

For these reasons, the Court should grant the motion to dismiss and dismiss the complaint with prejudice.


July 7, 2026                                          Respectfully submitted,


*/s/ Angela Cai*

| | | |
|---|---|---|
| Matthew J. Platkin | Simon C. Brewer* | Jarrid H. Kantor |
| Angela Cai | Carrie Y. Flaxman* | Yulieika Tamayo |
| **Platkin LLP** | Elena Goldstein* | Alexander L. Mitchell |
| 413 Washington Avenue, Unit 174 | **Democracy Forward Foundation** | **Antonelli Kantor Rivera PC** |
| Belleville, NJ 07109 | P.O. Box 34553 | 354 Eisenhower Pkwy, Suite 1000 |
| Phone: (973) 561-1951 | Washington, D.C. 20043 | Livingston, NJ 07039 |
| mplatkin@platkinllp.com | Phone: (202) 448-9090 | 908-623-3676 |
| acai@platkinllp.com | sbrewer@democracyforward.org | jkantor@akrlaw.com |
| | cflaxman@democracyforward.org | ytamayo@akrlaw.com |
| | egoldstein@democracyforward.org | amitchell@akrlaw.com |
| | * Admitted pro hac vice | |

*Counsel for Defendants*

33